## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JOHNATHAN WALLACE,

    Plaintiff,

    v.

LIEUTENANT GEMMATI, *et al.*,

    Defendants.

CIVIL ACTION NO. 1:24-cv-00010

(SAPORITO, J.)

## MEMORANDUM

Plaintiff Johnathan Wallace proceeds on claims of excessive force, unconstitutional conditions of confinement, and denial of medical care against five defendants affiliated with the Centre County Correctional Facility ("CCCF"). All parties have moved for summary judgment. (Docs. 61, 66). Because the evidence does not support a reasonable inference that the conditions in Wallace's cell constituted punishment, or that he received inadequate medical care, summary judgment will be granted to the defendants on those claims. However, because the record does not clearly resolve whether defendant C.O. Shearer subjected Wallace to objectively unreasonable force after he had stopped resisting, summary judgment will be denied on his excessive force claim against Shearer.

## I.   BACKGROUND

Wallace filed his original complaint on January 3, 2024, (Doc. 1), and was permitted to amend the complaint after his case was screened. (Docs. 8, 9). After the close of discovery, Wallace granted leave to file a second amended complaint, which is now the operative complaint. *See* (Doc. 46).

As relevant here, the unverified complaint alleges that on September 15, 2022, Wallace informed correctional officers "that his cell was dirty and [reek]ed of urine," and contained hair on the bed, "blood-like stains" on the floor and wall, and "a spider web and spider." An officer "swept and mopped" the cell, but Wallace was not satisfied. He refused to go back into the cell, but defendants Lt. Gemmati, Lt. Beals, C.O. Garver, C.O. Shearer, and C.O. Richner[1] "forced him there." He alleges that these defendants pushed him, tackled him to the ground, and hit his head against a wall.

Wallace sought medical attention, but Gemmati allegedly instructed a nurse "not to assess" Wallace. At "some time during the

---

[1] The latter two officers were named as "Shears" and "Ritner" in the amended complaint, but defendants' briefing identifies them as C.O. Shearer and C.O. Richner. *See* (Doc. 62).

morning," Wallace allegedly suffered a seizure and "notified medical." He had been prescribed Keppra for seizures, but the medication was allegedly discontinued after this incident.

Wallace seeks declaratory, injunctive, and monetary relief.[2] He was ultimately permitted to proceed on claims of excessive force, unconstitutional conditions of confinement, and denial of medical care against Gemmati, Ritner, Shearer, "C.O. Strunk," and "C.O. Quigley."[3] (Doc. 52). Because the complaint did not clearly indicate whether Wallace was a convicted prisoner or a pretrial detainee, it was unclear whether his claims should be evaluated under the Eighth Amendment or the Fourteenth Amendment, but he was explicitly permitted "to pursue the claims regardless of the ultimate legal basis." (Doc. 52 at 5, n. 2). The parties have now moved for summary judgment.

## II.   LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary

---

[2] Because Wallace is now incarcerated at SCI-Forest, and there is no indication that he will be returned to the CCCF, his claims for declaratory and injunctive relief will be dismissed as moot. *See, e.g., Griffin v. Beard*, 401 F. App'x 715, 716-17 (3d Cir. 2010).

[3] Defendants now indicate that these two defendants are the same person; Quigley was formerly known as Shrunk. (Doc. 62 at 1).

judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first

determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.   MATERIAL FACTS[4]

On September 8, 2022, Wallace was booked into the CCCF pending

---

[4] Wallace did not directly respond to defendants' summary judgment motion, although it appears that he intended his own motion to serve as a response. His filings cite only sporadically to supporting evidence. *See* (Docs. 66, 67). Any factual allegations in these filings are not competent evidence at the summary judgment stage, and they are ignored unless supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1). Nonetheless, the Court has reviewed and considered all the evidence the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, the court "may consider other materials in the record"). Where Wallace has not presented competent evidence to show a genuine dispute of material fact, defendants' fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa.

*(continued on next page)*

trial on criminal charges. *See* (Doc. 61-1 at 2, 9). On September 15, 2022, the date of the incident at issue, Wallace was in segregated custody on suicide watch in Unit A1. (Doc. 61-1 at 25, 61-4 at 6).

Defendants have presented surveillance footage of Wallace's cell and body camera footage from four prison officers. *See* (Docs. 61-2, 64). The video shows Wallace outside of his cell, handcuffed, arguing with officers. Wallace told the officers that he had been bitten by a spider in his cell and there were blood stains on the wall and "webs" under the bed. He refused to return to the cell until it was cleaned. An officer, identified in defendants' briefing as defendant Shearer, entered the cell to investigate. What Shearer saw is not clear from the video, but he concluded: "Well, you still got to come in here." Multiple officers ordered Wallace into the cell, and Wallace entered while continuing to argue. As an officer was about to close the door, Wallace walked back into the doorway as if trying to exit the cell. Two officers converged on him and pinned him against a wall inside of the cell.

When he was first pinned against the wall, Wallace was pushed into

---

L.R. 56.1.

a crouching position, with an officer's weight on his back. It is unclear from the video whether Wallace was physically resisting the officers from the crouching position.[5] (Cell Camera[6], 6:52-6:58). Wallace was then brought to a standing position, still pinned against the wall. His palms were open, and Shearer held onto his arms.

From this standing position, Shearer dragged Wallace to the opposite wall of the cell. Wallace raised his handcuffed hands toward the wall in an apparent attempt to brace himself. Wallace yelled: "I'm in cuffs, what are you doing?" Shearer then pushed Wallace into the far corner of his cell, and Wallace collided forcefully with the wall. Wallace continued to yell: "I'm in cuffs!" While Wallace was pinned in the corner, Shearer appears to press Wallace's head into the wall with his elbow or

---

[5] Defendants, citing to the surveillance video, describe Wallace as "struggling with the staff" during this period. (Doc. 62, ¶ 22). However, only Wallace's legs are visible while he was pinned into a crouch, because Shearer's body obstructs the view from the surveillance camera. (Cell Camera, 6:52-6:57). While it is possible that the officers were trying to bring Wallace to the floor and Wallace resisted, that is not apparent from the video, and the video does not show that Wallace received an order to lie down.

[6] Citations to timestamps refer to the surveillance video from the camera mounted in Wallace's cell. However, the summary of material facts also incorporates evidence from the body camera footage.

forearm. The video does not show that Wallace physically resisted the officers during this time. (*Id.*, 6:59-7:06).

Ultimately, other officers assisted by grabbing Wallace's legs and holding him horizontally on a table.[7] One officer yelled: "Relax!" Wallace replied: "I am relaxed, get my f\*\*\*ing face off the wall!" Lt. Gemmati said: "Do not move. This glove[8] is activated; I will use it." Wallace continued to verbally protest about the incident and the condition of the cell. After approximately 45 seconds in this position, Wallace's handcuffs were removed, and the officers left the cell.

After the officers left, Wallace can be heard yelling for medical attention for his injuries. A group of officers and medical staff returned to the cell, and a nurse examined Wallace through his cell window. Wallace reported injuries to his wrists, face, neck, and back. Less than two hours after the incident, officers and medical staff entered Wallace's

---

[7] Defendants describe Wallace as "wrestling" with the staff at this point. (Doc. 62, ¶ 23). At most, the video shows that his left leg briefly bent while the officers were holding it. However, it is unclear whether he was attempting to evade their grasp, or whether his leg bent because of the way in which the officers grabbed it. *See* (Cell Camera, 7:08-7:09).

[8] It is undisputed that this glove was a "taser glove."

cell, took photographs of his injuries[9], and performed a "full medical assessment." (Doc. 61-4 at 7-8). The medical records do not clearly document any diagnoses, but Wallace was prescribed Tylenol and an antibiotic ointment. Medical staff also found no evidence of a spider bite on Wallace. Wallace claimed that when he saw a spider in his cell, he "freaked out" because he has arachnophobia, which caused him to be "uncooperative" with security. (*Id.*).

The record lacks any evidence that Wallace suffered a seizure, complained of a seizure, or was prescribed seizure medication at the CCCF. On September 8, 2022, at his initial intake in the prison, he reported a history of seizures, but that he was not taking any medication for them. (Doc. 61-4 at 2-3). On December 13, 2022, after he had been released and then re-admitted to the prison, he claimed that he "had a seizure in 2019" and "does not require medications." (*Id.* at 4).

## IV.   DISCUSSION

Although the operative complaint frames Wallace's claims as Eighth Amendment claims, the record indicates that Wallace was a

---

[9] The record includes two photographs of Wallace (Doc. 61-1 at 21-22), but it is not clear if those were the only photographs taken.

pretrial detainee, not a convicted prisoner, when these events occurred. No party disputes that fact. *See* (Doc. 61-1 at 2, 13-16; Doc. 63 at 10-11; Doc. 67 at 2). Therefore, Wallace's claims will be evaluated under the Fourteenth Amendment standards applicable to pretrial detainees (which broadly prohibit conditions that "amount to punishment"), rather than the Eighth Amendment standards (which prohibit "cruel and unusual punishment"). *See Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979).

## A. Conditions of Confinement

Defendants are entitled to summary judgment on Wallace's conditions of confinement claim. As noted, the Fourteenth Amendment prohibits conditions that "amount to punishment" of a pretrial detainee. *See Hubbard v. Taylor,* 538 F.3d 229, 232 (3d Cir. 2008) (quoting *Bell,* 441 U.S. at 535). To meet this standard, prison conditions must either be imposed for the "express purpose" of punishment or "rationally connected to a legitimate purpose but excessive in relation to [that] purpose." *Hope v. Warden York Cnty. Prison,* 972 F.3d 310, 328 (3d Cir. 2020) (citing *Bell,* 441 U.S. at 538-39).

Although Wallace has alleged that his cell contained dirt and hair

and "reeked" of urine, he has not presented evidence of these conditions.[10] At most, he has presented evidence that there was a single spider in his cell that may have bitten him, and that officers forced him to return to the cell while the spider may still have been in it. Although Wallace may have reacted strongly because of arachnophobia, he has not presented evidence that the defendants were aware of this fear, so that fact cannot support an inference of deliberate punishment. Prison officials are permitted to dictate where and how prisoners are housed, and they enjoy "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *See Bell*, 441 U.S. at 547. No reasonable jury could find that the conditions amounted to

---

[10] Wallace refers to a written report from the day before his cell extraction. (Doc. 67 at 1). The report indicates that during a walkthrough of various units, an officer "spoke with [another inmate] about cleaning A1." The report notes that "[a] block of time has been set aside every day" for cleaning, and a "new bottle of covid cleaner" was delivered to the unit. *See* (Doc. 65-1). A1 refers to a unit, not a particular cell, *see* (Doc. 61-1 at 25), so there is no evidence that this report refers to Wallace's cell. Regardless, the fact that someone "spoke . . . about cleaning" would not reasonably suggest that a cell had hair or urine in it. Contrary to Wallace's argument, defendants are not required to produce video evidence of cleaning to obtain summary judgment.

"excessive" hardship in relation to that purpose, because Wallace suffered no more than a minor, temporary inconvenience and a superficial injury.[11]

## B. Medical Care

Defendants are also entitled to summary judgment on Wallace's medical care claims. To sustain a claim, Wallace would have to show that a defendant was deliberately indifferent to a serious medical need. *See Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023). He has presented no evidence that he suffered a seizure, complained of a seizure, or required seizure medication at the CCCF. To the extent his claim was premised on the staff's response to his injuries after the cell extraction, he has not explained how their response — evaluation through a window immediately after the incident, and full evaluation less than two hours

---

[11] *See, e.g.*, *Echevarria v. Cnty. of Bergen*, No. CV 23-3002 (ES) (CLW), 2025 WL 517955, at *7 (D.N.J. Feb. 18, 2025) (a single interaction with vermin "does not amount to a sufficiently serious deprivation" for a Fourteenth Amendment claim); *Chapolini v. City of Philadelphia*, No. 22-CV-284, 2022 WL 815444, at *14 (E.D. Pa. Mar. 17, 2022) ("certain unsanitary conditions, while uncomfortable or unpleasant," are not sufficiently serious or punitive); *Thomas v. SCI-Graterford*, No. CIV.A. 11-6799, 2014 WL 550555, at *4 (E.D. Pa. Feb. 12, 2014); *see also Sever v. Perrin*, No. 3:11-CV-29-KRG-KAP, 2013 WL 4855338, at *5 (W.D. Pa. Sept. 11, 2013) (a spider bite "that resolves quickly, with minimal care, and without residual effects is not under any definition of the term a serious medical need").

later — was inadequate to address his medical needs. Wallace's argument that this response was "against [defendants'] own policy" is unsupported by evidence, and regardless, that fact would not sustain a constitutional claim. *See Washington v. Salamon*, 2022 WL 4096877, at *5 (M.D. Pa. Sept. 7, 2022) ("a violation of prison policy is not equivalent to a constitutional violation") (citations omitted).

## C. Excessive Force

However, Wallace's excessive force claim will proceed against defendant Shearer. Unlike a convicted prisoner's Eighth Amendment claim, a pretrial detainee need not establish that a defendant used force "maliciously and sadistically for the very purpose of causing harm." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (citation omitted). Rather, "a pretrial detainee must show *only* that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 194 (emphasis in original) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015)). Although there is no "mechanical" application of this standard, courts can consider factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or

to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. Because prison officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," the court must assess the officer's actions based on "what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397, 399.

In this case, it is undisputed that Wallace's attempt to walk out of his cell in violation of multiple verbal orders justified the use of force to enforce these legitimate orders. *See, e.g., Giddings v. Rogers*, No. 1:22-CV-00097, 2024 WL 4186926, at *11 (M.D. Pa. Sept. 13, 2024). However, a reasonable jury could find that once the officers pinned Wallace against the wall of his cell, Wallace was no longer resisting them and was in no position to do so. Nonetheless, Shearer dragged Wallace to the other corner of his cell, caused him to collide forcefully with the wall, and pushed Wallace's head into the wall with his elbow or forearm, during which time the video does not suggest any resistance from Wallace.[12]

---

[12] *See, e.g., Riley v. Clark*, No. 4:20-CV-00325, 2025 WL 985228, at *12 (M.D. Pa. Mar. 31, 2025) (reconsidered on other grounds, *Riley v.*

*(continued on next page)*

A review of the other *Kingsley* factors demonstrates that summary judgment is not appropriate on this record. First, the evidence does not clearly document the extent of Wallace's injuries. Wallace received what the prison medical staff described as a "full evaluation," and they prescribed him Tylenol, but it is unclear what they diagnosed. Pain medication could suggest a painful injury, or a superficial one. Defendants submitted two photographs that appear to depict minor bruising on Wallace's face and neck, but the visibility of an injury is not dispositive. *See, e.g.*, *Riley*, 2025 WL 985228, at *12 (citing *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) ("*[D]e minimis* injuries do not necessarily establish *de minimis* force.")); *Ross v. Fiss*, No. 1:21-CV-02080, 2023 WL 2739638, at *7 (M.D. Pa. Mar. 31, 2023). A reasonable jury could construe this limited evidence in either side's favor.

An assessment of the "severity of the security problem at issue" favors Wallace. The video shows Wallace in "passive resistance": arguing

---

*Klahr*, 2025 WL 2024501 (M.D. Pa. July 18, 2025)); *Derrick v. Finnegan*, No. CV 22-4436 (SDW-SDA), 2025 WL 750960, at *6 (D.N.J. Mar. 7, 2025) ("[a] reasonable juror could conclude that Defendants were no longer facing an active disturbance or other threat to security," despite the plaintiff's prior resistance).

with officers, disregarding their verbal orders, walking out of his cell, and at most, briefly attempting to evade the officers' grasp. *See Riley*, 2025 WL 985228, at \*11; *Atkinson v. Apodaca*, No. 1:23-CV-00142-CBB, 2025 WL 712871, at \*7-8 (W.D. Pa. Mar. 5, 2025) ("Given that Atkinson claims he was restrained and passively resisting, a jury could conclude that the level of force used to compel him to enter his cell was unjustified."). The video does not show Wallace attacking or attempting to harm anyone. Defendants offer no evidence that any officer subjectively perceived a risk of such harm, nor evidence supporting their argument that this apparently isolated incident posed a "security risk to the entire facility."[13]

There is evidence that defendants tried to limit the amount of force they used, particularly at the start of the dispute. They repeatedly sought to achieve Wallace's compliance through verbal orders, and they

---

[13] Defendants assert that "[i]f more inmates joined in the disruptive and belligerent behavior of Wallace, the entire facility could have been at risk." (Doc. 63 at 14). But the video does not appear to show any other inmates out of their cells, and there is no evidence "to suggest that [Wallace] was in danger of escaping [his cell] or that Defendants were acting to prevent a disturbance from spreading." *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 291 (D.N.J. 2015) ("There is a significant distinction between using force to quell a prison riot or to stop violence from spreading, and using force when there is no real emergency.").

attempted to investigate his claim that the cell was dirty. Toward the end of the incident, Gemmati announced that he had a taser glove, apparently to head off any resistance by Wallace while he was being held on the table. This evidence precludes summary judgment for Wallace[14], but does not resolve the question of whether Shearer used objectively unreasonable force against Wallace while he was already subdued. Because the record does not plausibly indicate that any other officer used unreasonable force, summary judgment will be granted to all defendants except Shearer.

## D. Qualified Immunity

Alternatively, defendants argue that Shearer is entitled to qualified immunity. Qualified immunity applies to government officials performing discretionary functions unless (1) the "facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation," and (2) the alleged right was clearly established at the time of the violation. *See Thomas*, 88 F.4th at 281 (citation omitted). A clearly established right is one so apparent that "every reasonable official would

---

[14] Because Wallace's motion will be denied on the merits, the Court does not address the argument that it should be denied as untimely.

understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

It is defendants' burden to establish their entitlement to qualified immunity, *see Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014), and their argument is largely premised on the idea that the evidence does not show a constitutional violation.[15] For the reasons described above, that argument fails as to the excessive force claim against Shearer. Further, it is clearly established that prison officers may not "use gratuitous force against an inmate who has been subdued." *See Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009); *Jacobs*, 8 F.4th at 197 ("striking a physically restrained and nonthreatening inmate . . . [is] clearly unlawful"). Given this clearly established right, and the evidence that Wallace was subdued

---

[15] Defendants also contend that they were not "on notice" of any constitutional violation because "[t]he evidence does not meet the standard necessary to establish the possibility of a constitutional violation . . . as at most the actions/inactions are negligent or mistakes." (Doc. 63 at 24). However, they have not presented any argument or evidence for the proposition that their "actions/inactions" amounted to "negligen[ce] or mistakes."

as Shearer continued to apply force, Shearer is not entitled to qualified immunity at this stage. *See, e.g., Noel v. Miksich*, No. 3:22-CV-23, 2026 WL 494027, at *5 (W.D. Pa. Feb. 23, 2026) ("[a] jury could conclude that, at some point during this course of events, Noel ceased resisting, but Defendants continued to use a degree of force that qualified as excessive," precluding qualified immunity).

## V.    CONCLUSION

Accordingly, summary judgment will be granted on all claims except for Wallace's excessive force claim against Shearer. This case will be referred to the Court's Prison Litigation Settlement Program for potential mediation, unless a party objects within 14 days of this memorandum and order.

Dated: March 19, 2026                    *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge